## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RALPH ROMANTINE,                         )
                                         )    C.A. No. 09-973
                Plaintiff,               )
                                         )    Judge Donetta Ambrose
        v.                               )
                                         )    Magistrate Judge Lisa Pupo Lenihan
CH2M HILL ENGINEERS, INC.,               )
                                         )    Re: ECF No. 23
                Defendant.               )

## REPORT AND RECOMMENDATION

### I.    RECOMMENDATION

It is respectfully recommended that Defendant's Motion for Summary Judgment at ECF

No. 23 be denied.

### II.   REPORT

####    A.    FACTS

The following facts are taken from the parties' Statements of Undisputed Material Facts

and Responses thereto (ECF Nos. 25, 29, 29-1, 34, 35, 38-1) filed pursuant to Local Civil Rule

56 for the Western District of Pennsylvania, and are undisputed unless otherwise indicated.

####    Background

CH2M HILL Companies, Ltd. ("Defendant") is a full-service engineering, consulting,

construction and operations firm. Plaintiff, Ralph Romantine's ("Plaintiff") employment with

Defendant began in approximately December 2003, when Defendant purchased out of

bankruptcy certain assets and limited liabilities of J.A. Jones, Inc., including those of its

Lockwood Greene entity, a company that provided engineering, constructing, and consulting

services. After the purchase of those certain assets and limited liabilities, Lockwood Greene was

operated as a subsidiary to CH2M HILL Global, Inc.  In August 2007, Lockwood Greene Engineers, Inc. had its name changed to CH2M HILL Engineers, Inc.  Plaintiff was one of many Lockwood Greene employees who then became employed by Defendant.  Plaintiff's employment with CH2M HILL continued until July 2, 2008, when he was terminated.  Plaintiff was 58 years old at the time.

CH2M HILL is organized into several Business Groups, and at the time of Plaintiff's termination, Plaintiff worked in the Manufacturing & Life Sciences ("M&LS") Business Group. Plaintiff held a sales position, Senior Business Development Manager.  During Plaintiff's employment with CH2M HILL, Defendant's sales positions were at various locations throughout the United States.  According to Plaintiff, he and John Nevill ("Nevill"), handled, inter alia, the automobile and automotive parts industries.  Plaintiff was a member, along with four other persons, of the Discrete Manufacturing Sector, which included a collection of industries.  In the last few years of his CH2M HILL employment, Plaintiff's sales efforts were focused on the Big 3 automotive manufacturers, other automobile industry companies, construction materials, metals, concrete, chemicals (paint), plastics, and glass industries.

From October 2006 to December 2007, Plaintiff reported to Michael Gearhart ("Gearhart"), who, in October 2006, became the Director of the Discrete Manufacturing Sector of the M&LS Business Group.  As Director of the Discrete Manufacturing Sector of the M&LS Business Group, Gearhart, in turn, reported to Michael McKelvy ("McKelvy"), who, during this time period, was President of the M&LS Business Group.  In January 2008, Gearhart was promoted to M&LS Group President, and McKelvy was promoted to President and Chief Executive of Defendant's Industrial Client Group.  From that point in January 2008, Plaintiff began reporting to Susan Steele ("Steele"), then Director of the Discrete Manufacturing Sector of

the M&LS Business Group.  Steele, in turn, reported to Gearhart, who continued reporting to McKelvy.

The parties agree that while Plaintiff's direct supervisor in 2007, Gearhart rated Plaintiff's performance as "outstanding."  In Plaintiff's November 2007 "Performance Enhancement Process" for the plan year 2007, Gearhart indicated the following in the "Year End Summary":

> Always has a great positive attitude.  Always challenging the status quo looking for client solutions.  Strong team player.  Can be counted on to deliver his part and help/assist where necessary to complete.  Drives and leads proposal development.  Understands and complies with our internal processes.  Maintains contacts with clients after project is sold.  In some cases many years after projects are completed.

(2007 CH2M HILL Performance Enhancement Process, ECF No. 32-8 at 2.)  The review category "Results-Accomplishments and Outcomes You Achieved against Goals" included, among others, the following comments:

> Solid, consistent [business development].  American Axle is a great story.  From a single project in China in 2006.  We are now doing work in Brazil.  Proposing work in Mexico, Thailand, and Poland.  Continuing to provide services in China. . . . Above average oral and written skills.  Strong client presentations.  Demonstrated ability to think on his feet and alter presentations to react to client explicit questions or implied directions.  Takes lead in proposal development.  Takes ownership of every part of a proposal.  Actively maintains client relationships in spite of our corporate reorganizations.  This allows other [business groups] quick access and an ability to respond quickly to client demands. . . . Excellent teamwork generating proposals.  Stepped in late [] to provide some key write-ups.  Will go to where the action is to ensure a quality, responsive proposal gets delivered. . . . Exceeds expectations.

(ECF No. 32-8 at 1-2.)  The Performance Enhancement Process document also reflected that although building materials "is flat in 2007/2008," and "[f]iberglass is/was also dead in 2007 as a market," there are "[a] number of large [] cement opportunities in 2008."  Also, in February 2008, Gearhart indicated in a calendar notation: "Ralph & Nevill: Great Team."  (ECF No. 32-3 at 1.)

2008 Decline in Business

In 2008, the markets served by M&LS were declining.  Defendant's clients were reluctant to commit to capital spending, which affected the type and volume of projects awarded to M&LS.  The slowdown experienced by the M&LS Business Group, in hindsight, signaled the beginning stages of the downturn in the U.S. economy.  The parties dispute which sales segment had the poorest sales record for all of Business Development.  According to Plaintiff, Defendant's statement of sales as of the time of Plaintiff's termination shows that the Diverse Manufacturing Sector had the greatest domestic 2008 sales at that point than any other sector in the M&LS Group.  Defendant contends that Plaintiff is mischaracterizing this document which in fact shows that the "Pharma/Bio" sector had the greatest total sales, and that the Discrete Manufacturing Sector had the lowest sales when measured as a percentage of plan versus actual sales.  As a consequence of the declining markets and M&LS's slowdown, M&LS put a freeze on capital spending, cut its indirect expenses, and began reducing staff.  Beginning on approximately May 15, 2008, several Business Development group positions were eliminated periodically.  After Gearhart became M&LS President in January 2008, he went about balancing staff while reducing indirect expenses that affected profitability.

In approximately late February or early March 2008, Gearhart asked each one of his direct reports to provide him with their assessment of the Business Development professionals in

their respective groups and to do a force ranking of those individuals from top to bottom. No one followed his direction and gave a force ranking, but rather provided subjective comments only. The parties dispute the factors that the sector directors in M&LS used in assessing the M&LS Business Development employees. Defendant contends that the sector directors used factors such as the employees' relative sales performance, backgrounds, talents, skills, and versatility as described in Human Resources Director Kathy Pileggi's July 2, 2008 termination letter to Plaintiff. Plaintiff submits that in deposition, Gearhart indicated that he asked his direct reports for a force ranking, but did not testify that he instructed his reports to use the factors set out in the Pileggi letter.

Based in part on the information from the sales directors, Gearhart communicated to Human Resources the names of employees for potential layoffs in the M&LS Business Development Group. Defendant indicates that another reason Plaintiff was placed on the list was due to the declining business conditions in the marketplace. Defendant contends that the list was tentative and that an individual's placement on the list did not necessarily mean that the individual would be terminated. The list was sent to corporate headquarters in Denver for further analysis. Although requested in discovery, this list has not been produced by Defendant. Similarly, emails referenced on Gearhart's calendar to and from Pileggi and Denver headquarters relating to the list were not produced in discovery and could not be retrieved from Gearhart's computer hard drive.[1] Gearhart did not lay off any employee at the time he communicated the names of employees for potential layoffs to Human Resources, and continued to monitor staffing needs.

---

[1] Likewise, Gearhart could not retrieve emails from his personal computer or hard drive to and from Sue Steele, Plaintiff's direct supervisor at the time of his termination, regarding Gearhart's requested assessment of Plaintiff.

The parties dispute when the decision was made to terminate Plaintiff.  Defendant contends that Gearhart made the decision on July 2, 2008, when he was driving from Spartanburg, South Carolina to Atlanta, Georgia, and that the decision was prompted by two events:  1) a loss of certain large projects upon which Defendant had bid; and 2) a general deterioration in business conditions as shown by the preliminary financial information  for June. Gearhart communicated this decision to Human Resources Director Pileggi by telephone when he was getting fuel during his trip, and together, they telephoned Plaintiff that afternoon and terminated him.  Plaintiff contends that an Older Worker Benefit Protection Act (OWBPA) disclosure document dated June 5, 2008, refers to Plaintiff as being selected for termination, and a June 30, 2008 calendar notation by Gearhart states "5 June list.  Act on it.  I will do Ralph & John."  Defendant contends that the OWBPA disclosure document used with the release agreements given to employees who were laid off on July 2, 2008 was incorrectly dated, and the June 30, 2008 calendar entry does not contain a "5" before the word "June."

In addition to Plaintiff, the M&LS Business Group eliminated the positions of Business Development Managers Nevill, age 51 , who focused on the automotive market, and a few days later, Chris Linn ("Linn") age 65, who focused on the aviation and aerospace market.

<u>Restructuring after Plaintiff's Termination</u>

The parties dispute whether at the time of Plaintiff's termination, Gearhart made the decision that M&LS would not pursue business in the automotive and construction materials industries, except in unique "opportunistic" situations.  Plaintiff states that between the time of Plaintiff's termination and September, Gearhart testified that he and Vern Jackson ("Jackson") serviced these industries.  Around September 2008, after Plaintiff's termination, the M&LS Business Development group was restructured further.  Jackson was reassigned to the position of

Sector Director for Manufacturing, which included Discrete Manufacturing. After the September 2008 restructuring, Cherok, who was 52 years old at the time of Plaintiff's termination, and was a Business Development Manager who had previously specialized in the Food & Beverage industry under the direction of Jackson, was transferred to Plaintiff's position. John Anderson ("Anderson"), age 38 at the time of Plaintiff's termination, took over Cherok's former food and beverage business development opportunities; Gearhart testified that before the transfer to Food & Beverage, Anderson had typically worked in a back office environment. The parties dispute when Cherok was given the transfer; Plaintiff notes that Gearhart's deposition testimony places the transfer in September 2008, while Defendant submits that the transfer occurred in December 2008. In his new position, Cherok again reported to Jackson. Thereafter, to the extent there was M&LS business development work with the automotive and construction materials industries, the functions were performed by Gearhart, Jackson and Cherok. Plaintiff contends, however, that Cherok was working full time servicing Plaintiff's former accounts. By terminating Plaintiff, filling his position with Cherok and promoting Anderson to Cherok's former Food & Beverage position, Gearhart's 58 and 52 year-old Business Development managers were replaced with a 52 year-old and 38-year-old.

Comments upon which Plaintiff Relies

**Comment about Plaintiff's wife graduating from nursing school**

The parties agree that Gearhart and Plaintiff got along. Plaintiff spoke openly with others, including Gearhart, about his wife attending nursing school and her employment plans upon graduation. On four to six occasions, Gearhart told Plaintiff that since his wife was graduation from nursing school, he should retire, play golf and let his wife support him. The parties dispute whether Gearhart was joking. Plaintiff admits that the first time he heard this

remark from Gearhart, he did not take the remark seriously, but Plaintiff began to take it more seriously with each repetition. Plaintiff contends that this remark was repeated at least once in 2008.

### Miller's comment about "gray-haired men"

Joan Miller ("Miller") is a Senior Vice President of Business Development for the Energy and Chemicals Business Group of CH2M HILL, Inc. From May 2006 through May 2009, however, she was a member of the Board of Directors of Defendant, as a general, employee Board member. Miller made a presentation to a group of CH2M HILL employees in a meeting room in Atlanta in early 2005 and made a comment referring to the audience. George Alexander ("Alexander") overheard the remark and paraphrased it in deposition as follows:

> Well, basically, my paraphrasing would be that you have got a bunch of old men here and you don't have any young turks that are energetic and can go out and kick down new business and you can lower your overhead costs at the same time by getting rid of some of these white-haired old men. Your salary costs goes [sic] down.

(Alexander Dep. at 246, ECF No. 32-9.) Alexander also testified that Miller stated that the company needed to bring in some women. (Alexander Dep. at 249.) He then emphasized the following:

> The only thing that I want to make sure is in the record is the reason I remember this was I was so shocked that an officer of a company would say something like that because as free-wheeling as we were at Lockwood Greene, you would have been taken out and hung by your heels while we waited for all the attorneys to file the lawsuits.

(Alexander Dep. at 249.)

**McKelvy's July 2007 PowerPoint Presentation**

In July 2007, McKelvy, then the M&LS Group President, made a lengthy PowerPoint presentation on long-range planning to a large group, including Plaintiff. One slide in the presentation set forth a strategy of recruiting, including a bullet point that stated, "Focus on college recruiting and young hires." The parties dispute whether McKelvy had direct involvement in the termination of Plaintiff in that McKelvy and Gearhart discussed the termination several times, although Gearhart could not remember what was said in these conversations. The parties do not dispute that McKelvy said they wanted to get younger or get new staff fresh out of college. The parties agree that former employee Alexander testified that he told McKelvy the following:

> I told him that I thought that there were employment issues that were going to manifest themselves by doing that. You have got a 66 year-old aerospace guy and you are going to go lay him off and fire him or do whatever you want to with him and you are going to bring in some 23 year-old kid or you are going to bring in some 30 year-old woman. I'm not a lawyer, but it would seem to me that that is instant age discrimination.

> Q. So did you raise all that with McKelvy?

> A. I said it to him, yes. He said it is something we will deal with.

**McKelvy's 2004-2005 comments concerning business development**

In a telephone conversation in approximately late 2004, McKelvy told Alexander that the Business Development salary expenses that Alexander had proposed were too high, and said something about the group needing to get "younger and cheaper." In a conversation between McKelvy and Alexander during the first quarter of 2005—this one while the two walked to McKelvy's car in the parking lot at the Spartanburg, South Carolina office—McKelvy used the

term "younger and cheaper" in the context of describing his vision for how the role of Business Development manager should be modified. Plaintiff indicated that he heard many people quote McKelvy's remark.

### McKelvy's "hunters" comment in 2004-2005

Alexander testified that he heard McKelvy state that "there are hunters and there are doers. Hunters go out kicking down doors looking for business. We don't have hunters. These old guys can't be hunters?" Alexander testified that McKelvy was referring to both Business Development personnel in the M&LS group and in the Chemicals Group. The parties agree that on another occasion, McKelvy told Alexander (with reference to the M&LS Business Development Group), that "we had too many herdsmen and the hunters were all worn out." Alexander indicated that the term "herdsmen" refers to sales people who do not bring in business but simply try to maintain existing customers.

### CEO's comments in June 2009 *Fortune* Magazine

In a June 2009 interview of Lee McIntire ("McIntire"), the Chief Executive Officer ("CEO") of CH2M HILL Companies, Ltd., by *Fortune* Magazine, McIntire stated that there was a backlog of orders within the CH2M HILL Companies, Ltd. global family of companies, such that 1800 jobs would be filled in 2009. The *Fortune* Magazine article referred to business that was already in the door, not business activity for M&LS's Business Development group.

### Campbell's transfer within CH2M HILL to the Energy & Chemicals business group

Prior to May 31, 2008, Colleen Campbell, then age 34, was a trainee Business Development Manager. She was hired by a CH2M HILL company on or about August 11, 2005, became a Marketing Manager in April 2006, and in June 2006, transferred to M&LS's Business

Development group.  The parties dispute what prompted her desire to transfer out of M&LS's

Business Development Group.  Defendant contends that her desire to transfer stemmed from the

fact that beginning in 2007, M&LS Business Development group had unsuccessfully bid on

several significant projects; Plaintiff contends that her desire stemmed from the fact that she was

told by Steele, Plaintiff's and Campbell's supervisor, that Campbell's job was in danger.  The

parties also dispute when discussions began between Steele and Campbell concerning

Campbell's transfer.  Defendant contends that discussions began in the second half of 2007;

Plaintiff contends that emails produced in discovery reveal that Campbell's job search did not

begin until late March 2008, when she was tipped off by Steele that her M&LS job was in danger

and that she needed to find another.  Defendant initially states in its Statement of Undisputed

Material Facts at ECF No. 25 at ¶ 140, that the CH2M HILL's Energy Group job vacancy was

posted.  Plaintiff disputes this statement and contends that the job was found for her without

those in the unit knowing what role she would play or to whom she would report.  In response to

Plaintiff's assertions, Defendant states at ECF No. 38-1 at ¶ 140 that it is not material whether

the job was posted because "[e]ven novices in the business world know that people obtain

transfers and promotions, not by waiting for a job vacancy, but by persuading managers that they

could fulfill an unmet business need."  The parties agree that by obtaining this transfer, Campbell

barely avoided being terminated.  Gearhart's decision to terminate Campbell was made moot by

Campbell's transfer.  Plaintiff was not aware of the vacant position to which Campbell was

transferred and had not been told that his position was in danger.

B.     LEGAL STANDARD

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact; that is, the movant must show that the evidence of record is insufficient to carry the non-movant's burden of proof.  *Id*.  Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis added by *Matsushita* Court).  An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty-Lobby, Inc*., 477 U.S. 242, 248 (1986).  In *Anderson*, the United States Supreme Court noted the following:

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.  . . . [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Id.* at 249-50 (internal citations omitted).

While any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form. *See* Fed. R. Civ. P. 56 (e); *Celotex Corp.*, 477 U.S. at 324; *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990). The non-movant cannot rely solely on unsupported assertions or conclusory allegations. *Anderson*, 477 U.S. at 249.

Here, Defendant contends that it is entitled to judgment as a matter of law on Plaintiff's claims and argues the following: 1) Plaintiff cannot prove that Defendant's legitimate, nondiscriminatory reasons for his layoff are a pretext for age discrimination; 2) certain comments highlighted by Plaintiff cannot be used to prove pretext because some were understood to be jokes, some were made by non-decision makers and did not relate to the layoff decision, were remote in time, and do not reflect age bias, and 3) Plaintiff cannot make out a prima facie case for his discriminatory failure to transfer claim because he did not apply for any transfer or express an interest in a transfer. Plaintiff responds that there are several issues of material fact in dispute that preclude judgment for Defendant as a matter of law.


C.    <u>ANALYSIS</u>

<u>Wrongful Discharge pursuant to the ADEA</u>

The ADEA prohibits employers from discriminating against "any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). "[A] plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age

was the 'but for' cause of the challenged adverse employment action." *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2352 (2009).[2]

When there is no direct evidence of discrimination, a plaintiff may use circumstantial evidence to establish discrimination using the three-prong shifting analysis originally set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).[3] Pursuant to the *McDonnell Douglas* burden shifting analysis, a plaintiff employee must first establish a prima facie case of discrimination. *Fasold*, 409 F.3d at 184. In order to make out a prima facie case in an ADEA action, a plaintiff must establish the following: 1) that he is 40 years of age or older; 2) that he was qualified for the job from which he was discharged; 3) that he was discharged; and 4) was replaced by someone sufficiently younger to give rise to an inference of discrimination. *Id.* (citing *Potence v. Hazelton Area Sch. Dist.*, 357 F.3d 366, 370 (3d Cir. 2004); *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 249 (3d Cir. 2002)). The *Fasold* Court emphasized that there is no "hard and fast rule covering what a plaintiff must show" in establishing a prima facie case, but that the precise elements may vary with the circumstances. *Fasold*, 409 F.3d at 185 n. 10. Consequently, when an employee is terminated in a reduction in force ("RIF") case, he must show the following to establish a prima facie case of discrimination: 1) he was at least 40 years of age, 2) his employment was terminated, 3) he was qualified for the job from which he was terminated, and 4) the employer retained an employee who was similarly situated and

---

[2] "An act or omission is not regarded as a cause of an event if the particular event would have occurred without it." *Gross,* 129 S. Ct. at 2350 (quotation marks and citation omitted).

[3] Following the United States Supreme Court's decision in *Gross*, the United States Court of Appeals for the Third Circuit discussed whether the *McDonnell Douglas* paradigm is still applicable to ADEA cases. In *Smith v. City of Allentown*, 589 F.3d 684 (3d Cir. 2009), the court of appeals noted as follows: "While we recognize that *Gross* expressed significant doubt about any burden-shifting under the ADEA, we conclude that the but-for causation standard required by G*ross* does not conflict with our continued application of the *McDonnell Douglas* paradigm in age discrimination cases." *Id.* at 691.

sufficiently younger to raise an inference of age discrimination. *Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231, 235-36 (3d Cir. 1999).

After Plaintiff has established his prima facie case, the burden of production (but not the burden of persuasion) shifts to Defendant employer to articulate some legitimate, nondiscriminatory reason for Plaintiff's termination. *See* Fasold, 409 F.3d at 184 (citing *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 n. 11 (3d Cir. 2004); *Shellenberger v. Summit Bancorp. Inc.*, 318 F.3d 183, 187 (3d Cir. 2003)). The employer need not prove, however, that the proffered nondiscriminatory reasons actually motivated the decision to terminate. *See Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) (discussing *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000)). If the Defendant employer is able to articulate one or more such reasons, the Plaintiff "employee must then proffer evidence that is sufficient to allow a reasonable finder of fact to find by preponderance of the evidence that the employer's proffered reasons are false or pretextual." *Id.* (citing *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003)).

To survive a motion for summary judgment at step three of the burden shifting analysis, Plaintiff must present some evidence from which a reasonable jury could either: "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993); *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 523 (3d Cir. 1992)). In *Fuentes*, the United States Court of Appeals for the Third Circuit further explained the quantum of proof required at step three as follows:

To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

*Fuentes*, 32 F.3d at 765 (emphasis in original) (quoting *Ezold*, 983 F.2d at 531) (other internal quotations omitted). That is, the plaintiff must show, not simply that the defendant's articulated business reason was wrong, "but that it was so plainly wrong that it cannot have been the employer's real reason." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997). The plaintiff must "present evidence contradicting the core facts put forward by the employer as the legitimate business reason for its decision." *Kautz*, 412 F.3d at 467. Evidence contradicting these core facts must be directed at the decision-maker's belief; plaintiff's own beliefs and personal judgments, without more, will not raise a genuine issue of material fact. *Simpson v. Kay Jewelers, Inc.*, 142 F.3d 639, 647 (3d Cir. 1998) ("Simpson's view of her performance . . . is not relevant.").

Here, Defendant assumes for purposes of its Motion for Summary Judgment only, that Plaintiff can satisfy the elements of his prima facie case. (Defendant's Memorandum of Law in Support of its Motion for Summary Judgment, ECF No. 24 at 8 [hereinafter "ECF No. 24 at __"].)

Moving to the second step of the *McDonnell Douglas* paradigm, Defendant has met its burden of production by articulating legitimate business reasons for Plaintiff's termination.

According to Defendant, Plaintiff's position was eliminated in an effort to "cut costs and restructure the M&LS Group's workforce." (ECF No. 24 at 9) (footnote omitted). Specifically, Defendant contends that Gearhart made the decision to terminate Plaintiff based on the following financial information: 1) Plaintiff's sales segment, Discrete Manufacturing, was the segment with the poorest sales record for all of Business Development; 2) M&LS's markets were declining; 3) by mid-2008, M&LS's new business intake for the year was a negative 60%; 4) the decision to no longer pursue the very markets that Plaintiff had focused on because of the market's financial collapse and lack of capital spending. (ECF No. 24 at 9.) Further, the criteria considered by Defendant in deciding who would be terminated in the RIF was as follows:

> We have made our selections for personnel reductions based upon a number of factors including, by way of example only, the following: an overall assessment of the M&LS business unit and its various business segments; a three to six month workforce planning forecast; individual employee workload levels, relative individual employee performance compared to peer group, if applicable; and criticality of skills and competencies for current and future work.

(July 2, 2008 letter from Kathy Pileggi to Plaintiff, ECF No. 32-17 at 1.)

Plaintiff directs the Court to several record inconsistencies and implausibilities in Defendant's proffered reasons that demonstrate such reasons are unworthy of belief.

First, within two months of Plaintiff's termination, Cherok was assigned to the responsibilities and functions that were formerly assigned to Plaintiff. Defendant's Response to Plaintiff's First Set of Interrogatories at Interrogatory No. 5, ECF No. 32-1 at 21 states that "Mr. Gearhart and Mr. Jackson assigned Mr. Cherok to the responsibilities and functions that formerly were Plaintiff's, and made this assignment after July 2, 2008." Gearhart testified in deposition that Cherok was assigned to this position in September 2008. (Gearhart Dep. at 119-120.) The

two month interim between Plaintiff's termination and Cherok's transfer is particularly inconsistent in light of Human Resources Director Pileggi's representation to Plaintiff indicating that his selection for termination was based partly on a "three to six month workforce planning forecast . . . ."[4] (July 2, 2008 letter to Plaintiff from Kathy Pileggi, Human Resources Director, ECF No. 32-17 at 1.)

Record evidence also indicates that Plaintiff was servicing a number of different industries in the last few years of his employment, and at the time of his termination, was servicing the following: automobile, automobile parts, trucks, farm equipment, building construction, metals, chemicals, paint manufacturing, general manufacturing, food and beverage, and cement industries. (Romantine Affidavit, ECF No. 32-2 at ¶ 13.) In fact, in his Performance Enhancement Process Evaluation for 2007, Gearhart recognized that Plaintiff was servicing the cement industries and that there were a number of large opportunities in this area for 2008. A reasonable jury could conclude that the alleged collapse of two of these sectors would not have disqualified Plaintiff from servicing the rest, and that Plaintiff would be needed to service the large opportunities in the cement industry in 2008.

Similarly, financial information allegedly relied upon by Defendant in making its decision to terminate Plaintiff included the contention that Plaintiff's sales sector, Discrete Manufacturing, was the sector with the poorest sales record for all of Business Development. Yet, Defendant's summary of the year-to-date new business, by sector, as of June 27, 2008 reflects that the Diverse Manufacturing Sector had the greatest domestic 2008 sales at that point

---

[4] Defendant has not produced this "three to six month workforce planning forecast" in response to Plaintiff's discovery request, indicating that the record does not support that a hard copy exists. Defendant asserts that "the three to six month planning forecast was based on an overall assessment and verbal discussions that occurred within M&LS regarding various employees' focus." (Defendant's Response to Plaintiff's Supplemental Statement of Material Facts, ECF No. 35 at ¶43.)

than any other sector in the M&LS Group.  Further, it had the second highest total sales

(domestic and international), trailing just behind the Pharm/Bio Sector,[5] while the remaining five

sectors lagged far behind.

Likewise, another inconsistency appears in the record concerning Defendant's articulated

reasons that M&LS's markets were declining, and that by mid-2008, M&LS's new business

intake for the year was a negative 60%.  These reasons appear inconsistent with the statements of

CEO McIntire less than one year after Plaintiff's termination in *Fortune* magazine that the

company would be filling 1800 jobs in 2009 to service the backlog of orders within the CH2M

HILL Companies, Ltd. global family of companies.

Further, Defendant gives inconsistent accounts as to how it selected those employees that

would be subject to the RIF.  In her letter to Plaintiff, Human Resources Director Pileggi

indicated that selections were based in part, on "individual employee workload levels, relative

individual employee performance compared to peer group, if applicable, and criticality of skills

and competencies for current and future work."  (ECF No. 32-17 at 1.)   Gearhart testified that in

creating the lists, he solicited input from Steele, Plaintiff's direct supervisor at the time of his

termination.  He testified that he received this input via telephone calls or email.  He also

emailed Pileggi regarding RIF issues.  (Gearhart Dep. at 7-9.)  Yet, discovery has produced none

of Gearhart's emails with Steele or Pileggi regarding these communications.  In addition, when

soliciting input from Steele and others, Gearhart received nothing in writing from these sources

regarding Plaintiff's performance; nor did Gearhart refer to Plaintiff's performance review.

(Gearhart Dep. at 13-14.)  Gearhart testified that he asked each of his direct reports in late

---

[5] Total sales as of June 27, 2008 for the Discrete Manufacturing Sector was $38,660,708, while the Pharm/Bio Sector reported $39,719,009.

February or early March to provide him with their assessment of the Business Development

professionals in their group and to "do a force ranking of those individual from top to bottom."

(Gearhart Dep. at 14.) Gearhart indicated that Steele did give him a subjective assessment of

each individual verbally, but did not do a force ranking. Gearhart could not recall any details of

Steele's subjective assessment. (Gearhart Dep. at 14-15.) He also asked for input from Vern

Jackson, one of Gearhart's direct reports who had no direct working relationship with Plaintiff.

Jackson did not do a force ranking and indicated that "he just didn't have a good feeling" about

his experiences with Plaintiff and gave Gearhart no specific examples. (Gearhart Dep. at 17.) In

fact, Gearhart did not recall in his deposition that he had rated Plaintiff "outstanding" in his 2007

performance review of Plaintiff when Gearhart was Plaintiff's direct supervisor. (Gearhart Dep.

at 18-19.) In addition, Gearhart testified that initially, Plaintiff was placed on a RIF list

sometime in March 2008, and his status was reviewed at various times between March and July

2, 2008. (Gearhart Dep. at 6.) He further testified that the list was made up by some of his direct

reports and put in an Xcel Spreadsheet report format by Human Resources Director Pileggi. The

lists went to the Human Resources Group in Denver. (Gearhart Dep. at 6-7.) Yet, the lists were

never produced in discovery.[6]  A reasonable jury could conclude, based upon the absence of

documentation of the assessment process, the inability to produce the RIF lists and emails related

to the assessment process, the inconsistency between the stated criteria to be considered in the

assessments and the assessments actually received by Gearhart, that the reasons given for

Plaintiff's selection in the RIF were in fact not the real reasons.

---

[6] The Defendant has indicated that it has located several XCEL Spreadsheets prepared for outside counsel for adverse impact review, and that it has disclosed these Spreadsheets in a privilege log. ( Defendant's Response to Plaintiff's Supplemental Statement of Material Facts, ECF No. 35 at ¶ 22.)

<u>Comments Relating to Age</u>

The United States Court of Appeals for the Third Circuit has distinguished between "comments made by individuals within and those by individuals outside the chain of decisionmakers who have the authority to discharge." *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 521 (3d Cir. 1997). The court of appeals has "generally held that comments by those individuals outside of the decisionmaking chain are stray remarks, which, standing alone, are inadequate to support an inference of discrimination." *Id.* (citing *Gomez v. Allegheny health Serv., Inc.*, 71 F.3d 1079, 1085 (3d Cir. 1995) (other citation omitted)).

The parties dispute whether McKelvy was involved in the decision to terminate Plaintiff. Plaintiff directs the Court to Gearhart's deposition testimony where he indicates that there were some meetings between McKelvy and himself prior to Plaintiff's termination where Plaintiff was discussed, and where Gearhart would review with McKelvy what he was doing, or planning on doing, to reduce Defendant's indirect expenses. (Gearhart Dep. at 24-25.) Defendant submits the affidavit of McKelvy and the affidavit and supplemental affidavit of Gearhart in support of Defendant's position that McKelvy was not involved in the decision to terminate. A reasonable jury could conclude, however, that in light of Gearhart's deposition testimony that he did discuss what he was doing to reduce indirect expenses with McKelvy, and that McKelvy was Gearhart's direct supervisor, that McKelvy may have been involved in the decision.

Even if McKelvy was not involved in the decision to terminate, the United States Court of Appeals for the Third Circuit has also indicated the following with regard to stray remarks by non-decisionmakers:

> Although stray remarks by non-decisionmakers alone are insufficient to establish discriminatory intent, we have held that such remarks can still constitute evidence of the atmosphere in

> which the employment decision was carried out, and therefore can
> be relevant to the question of retaliation. . . . Such evidence "may
> be critical for the jury's assessment of whether a given employer
> was more likely than not to have acted from an unlawful motive."
> Accordingly, stray remarks by nondecisionmakers may be properly
> used by litigants as circumstantial evidence of discrimination.

*Walden*, 126 F.3d at 521 (quoting *Antol v. Perry*, 82 F.3d 1291, 1302 (3d Cir. 1996) and citing

*Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 546 (3d Cir. 1992) (evidence of

discriminatory atmosphere may be relevant because it tends "to add 'color' to the employer's

decisionmaking processes and to the influences behind the actions taken with respect to the

individual plaintiff") (other citations omitted)).  The district court retains its discretion to admit

or exclude stray remarks by nondecisionmakers under the general principles of relevancy.  *Id.*

(citing Fed. R. Evid. 401).

Here, the Court finds that McKelvy's comments concerning the organization getting

"younger and cheaper," and "hunters vs. herdsmen," along with Miller's comment about "getting

rid of white-haired men to lower overhead costs," even though remote in time from the decision

to terminate Plaintiff, are relevant as circumstantial evidence of age discrimination.   A

reasonable jury could conclude that an ageist atmosphere or environment existed at Defendant

for some period of time, and that representatives of the company were attempting to act in

accordance with company philosophy.  *See Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1214 (3d

Cir. 1995) ("[D]iscriminatory comments by nondecisionmakers, or statements temporally remote

from the decision at issue, may properly be used to build a circumstantial case of

discrimination.") (citing *Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43, 54 (3d Cir. 1989));

*Josey v. John Hollingsworth Corp.*, 996 F.2d 632, 641 (3d Cir. 1993) (noting that atmosphere in

which a company makes its employment decision can be circumstantial evidence of discrimination).

<u>Gearhart's Comments Relating to Plaintiff's Retirement</u>

As to comments or questions regarding retirement, many courts have recognized that an employer may make reasonable inquiries into the retirement plans of its employees for purposes of succession planning or to address rumors concerning retirement for purposes of staffing. *See, e.g.*, *Wallace v. O.C. Tanner Recognition Co.*, 299 F.3d 96, 100-101 (1st Cir. 2002) (citing *Shorette v. Rite Aid of Maine, Inc.*, 155 F.3d 8, 13 (1st Cir. 1998); *Glanzman v. Metropolitan Management Corp.*, 391 F.3d 506, 513 (3d Cir. 2004); *Moore v. Eli Lilly & Co.*, 990 F.2d 812, 818 (5th Cir. 1993); *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997); *Colosi v. Electri-Flex Co.*, 965 F.2d 500, 502 (7th Cir. 1992); *Montgomery v. John Deere & Co.*, 169 F.3d 556, 560 (8th Cir. 1999); *Cox v. Dubuque Bank & Trust Co.*, 163 F. 3d 492, 497 (8th Cir. 1998); *Kelly v. Drexel Univ.*, 907 F. Supp. 864, 877 (E.D. Pa. 1995). Courts have also recognized, however, that some retirement inquiries are so unnecessary and unreasonable, that such inquiries may constitute evidence of age discrimination, especially when placed in the context of all facts and circumstances in a particular case. *Greenberg v. Union Camp Corp.*, 48 F.3d 22, 28-29 (1st Cir. 1995) (citing *Calhoun v. Acme Cleveland Corp.*, 798 F.2d 559, 562-63 (1st Cir. 1986)); *Guthrie v. J.C. Penney Co.*, 803 F.2d 202, 208 (5th Cir. 1986); *Pitasi v. Gartner Group, Inc.*, 184 F.3d 709, 715 (7th Cir. 1999) (quoting *Kaniff v. Allstate Ins. Co.*, 121 F.3d 258, 263 (7th Cir. 1997)); *Cox v. Dubuque Bank & Trust Co.*, 163 F.3d 492, 497 (8th Cir. 1998); *Buckley v. Hospital Corp. of America*, 758 F.2d 1525, 1528 (11th Cir. 1985).

As noted above, Plaintiff has presented evidence from which a reasonable jury could believe that an ageist environment or atmosphere existed at Defendant, and that Gearhart's

retirement comments to Plaintiff were not jokes, but an attempt by Gearhart to fall in line with McKelvy's corporate philosophy that Business Development needed to get younger. Viewing the facts in the light most favorable to Plaintiff, genuine issues of material fact exist as to whether Defendant's repeated retirement inquiries were so unnecessary and unreasonable as to constitute evidence of age discrimination, especially when viewed in conjunction with other evidence of record.

<u>Discriminatory Failure to Transfer pursuant to the ADEA</u>

Here, the Court views Plaintiff's Failure to Transfer claim as an attempt to present additional evidence that the reasons given for his discharge were not the real reasons, but a pretext for age discrimination. Plaintiff has raised genuine issues of material fact regarding the transfer of then 34 year-old Campbell. Record evidence does not reveal that Plaintiff was warned that his position was in danger as was Campbell. In an email from Campbell to Joan Miller, Campbell indicates that "I've been told I am at risk and the rest I can save for the phone." (ECF No. 32-13.) In his affidavit, Plaintiff states that in early spring 2008, Campbell told him that she had been warned by Steele, their shared immediate supervisor, that her job was in danger and that she should start looking for another job. Although Plaintiff may have been aware of financial difficulties within the company, he was not warned by Steele that his job was in danger. A reasonable jury could conclude that the reason he was not warned is because Defendant wanted Business Development to get younger.

Record evidence also reflects that Miller wanted to assist Campbell in her efforts to remain with Defendant. (ECF No. 32-13 at 3.) The record does not reflect that the same efforts were extended to Plaintiff.

Further, record evidence relating to Campbell's transfer raises an issue of material fact that, but for the Plaintiff's age, he would not have been terminated. With the United States Supreme Court's decision in *Gross*, Plaintiff bears a higher burden; to show pretext at this stage, he must proffer sufficient evidence for a reasonable jury to find that age discrimination was the "but for" cause of his termination. *See Gross*, 129 S. Ct. at 2350 (plaintiffs must show that age was a determinative factor in defendant's discharge decision, not that it was just one motivating factor). Plaintiff has raised an issue of material fact that Defendant warned Campbell that her position was in danger, and that Defendant then went to some effort to assist her in locating another position within the company, even though the decision had been made to terminate her. (ECF No. 32-13 at DF 04103.) A reasonable jury could conclude that the reason Plaintiff was discharged, while Campbell was transferred, was because of Plaintiff's age.[7]

Plaintiff has raised genuine issues of material fact from which a reasonable jury could conclude that he was terminated because of his age. Although Defendant has come forward with legitimate business reasons for Plaintiff's termination, Plaintiff has come forward with evidence demonstrating inconsistencies and implausibilities in Defendant's proffered reasons. On summary judgment, viewing the evidence in the light most favorable to Plaintiff, the Court concludes that a reasonable jury could find that the reasons offered by Defendant for terminating Plaintiff's employment were not its true reasons, but rather, a pretext for age discrimination. Thus, Plaintiff has met his burden of rebutting Defendant's proffered reasons for terminating his employment, and Defendant's Motion for Summary Judgment should be denied.

---

[7] Record evidence also reflects that Campbell's 2007 overall performance evaluation was "achieved expectations." (Defendant's Response to Plaintiff's Supplemental Statement of Material Facts, ECF No. 35 at ¶ 86.) Further, Gearhart indicated in calendar notations that her behavior was characterized as "mercurial." (ECF No. 32-3 at DF 03342.)

## III.     CONCLUSION

For the reasons discussed above, it is respectfully recommended that Defendant's Motion for Summary Judgment at ECF No. 23 be denied.

In accordance with the Magistrate Judge's Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Federal Rule of Civil Procedure 72(b)(2), and Local Rule of Court 72.D.2., the parties are allowed fourteen (14) days from the date of service to file objections to this report and recommendation.  Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Dated: November 24, 2010                                     BY THE COURT:


                                                             _____
                                                             LISA PUPO LENIHAN
                                                             United States Magistrate Judge


All Counsel of Record
Via Electronic Mail